# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-CA-01260-COA

**ESTATE OF ROY SUMRALL AND ESTATE OF DELLA SUMRALL**                    APPELLANTS

**v.**

**SINGING RIVER HEALTH SYSTEM**                    APPELLEE

DATE OF JUDGMENT: 08/07/2017
TRIAL JUDGE: HON. ROBERT P. KREBS
COURT FROM WHICH APPEALED: JACKSON COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANTS: ROBERT W. SMITH
ATTORNEYS FOR APPELLEE: BRETT K. WILLIAMS
 JAMES EVERETT LAMBERT III
NATURE OF THE CASE: CIVIL - MEDICAL MALPRACTICE
DISPOSITION: AFFIRMED - 04/14/2020
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE BARNES, C.J., GREENLEE AND McDONALD, JJ.**

**GREENLEE, J., FOR THE COURT:**

¶1. Roy and Della Sumrall (the Sumralls) filed a medical-malpractice claim against Singing River Health System (Singing River) under the Mississippi Tort Claims Act (MTCA), Mississippi Code Annotated sections 11-46-1 to -23 (Rev. 2002), for injuries sustained to Della after the removal of a central venous catheter. After a bench trial, the circuit court entered judgment in favor of Singing River. The Sumralls appealed from that judgment to this Court, citing five errors. This Court reversed and remanded the case (*Sumrall I*), finding the circuit court abused its discretion by allowing Singing River's expert

witness to testify outside the scope of his designation.[1]  After a second bench trial, the circuit

court again entered judgment in favor of Singing River.  It is from that order the Sumralls[2]

now appeal.  Finding no error, we affirm the circuit court's judgment.

## FACTS AND PROCEDURAL BACKGROUND

### I.      Background

¶2.      On February 23, 2012, sixty-eight-year-old Della Sumrall was admitted to Ocean

Springs Hospital (OSH), a facility owned and operated by Singing River, with severe

inflammation of the gallbladder[3] and a pancreatic pseudocyst.  In addition, Della suffered

from a litany of other co-morbidities, including diabetes, a renal artery stent, coronary artery

bypass grafting, coronary artery disease, a partially collapsed lung, chronic obstructive

pulmonary disease (COPD), and more.  The record also shows that Della smoked heavily

prior to 2012.  Although Della was considered a high risk for surgery, Dr. Edward Dvorak,

her attending physician, recommended removal of Della's gallbladder and ordered a central

line be placed in her external jugular vein because of the expectation of a prolonged recovery

course.[4]  The surgery was successful.

---

[1] *Sumrall v. Singing River Health Sys.*, 189 So. 3d 661, 664, 670 (¶¶9, 32) (Miss. Ct. App. 2015) (hereinafter "*Sumrall I*").

[2] The Sumralls died after the first trial, and their estates were substituted as parties.

[3] Dr. Edward Dvorak testified that he had to convert from a "laparoscopic procedure," a minimally invasive procedure, to an "open procedure," which involves a much larger incision, due to the severity of inflammation in Della's gallbladder.  According to Dr. Dvorak, the necessity of the conversion is "fairly rare."

[4] A "central line" or central venous catheter is a "a catheter passed through a peripheral or central vein, ending in the superior vena cava or right atrium, for measurement

¶3.     Nurse Chequita Steele, a registered nurse employed at OSH at the time of the proceedings, was tasked with caring for Della from or around the time of her surgery to the date of her discharge.  Nurse Steele testified that Della had complained about not being able to breathe while lying flat on her back and that she preferred to sit up.

¶4.     On February 29, 2012, Dr. Dvorak ordered that Della be discharged to the Comprehensive Rehabilitation Center (CRC) in Pascagoula.[5]  At the time, Della suffered from a partially collapsed lung,[6] pneumonia, and chronic COPD, and she required oxygen. At or around 12:00 p.m., Nurse Steele reclined Della's chair at an angle less than ninety degrees.  According to Nurse Steele's trial testimony, Della had been reclined "somewhere between 30 and 45 [degrees].  Probably closer to 45 [degrees]."  Thereafter, Nurse Steele informed Della about the need to remove the central line and the removal process.  At or around 4:10 p.m., Nurse Steele began the removal process.  The record shows that Nurse Steele removed the dressing that covered the central line's insertion site, cut the sutures, applied pressure to the site using gauze, instructed Della to take a breath and bear down, and then removed the line.  Nurse Steele testified that she held pressure over the removal sight for approximately one minute.  After one minute had elapsed, Della started gasping for

of central venous pressure or for infusion of hyperosmolar solutions."  PDR Medical Dictionary 327 (3d ed. 2006).  As noted by the parties, they are used to give medicines, fluids, nutrients, or blood to patients.

[5] Although Dr. Dvorak initially ordered for Della to be discharged, as she was "medically ready," there was further testimony that Della's discharge order was later rescinded because Della's family members "were not comfortable" with Della's discharge.

[6] Della suffered from chronic atelectasis of the right upper lobe.

breath and became unresponsive.

¶5.    Della was given emergency treatment in her room. Shortly after, Della was transported to the intensive-care unit (ICU) where she was observed in respiratory arrest. The respiratory arrest resulted in anoxic brain injury and with a degree of permanent impairment. Due to her condition, a second central line was inserted while she was in the ICU. Della's condition improved over nineteen days, so she was ordered to be discharged from the ICU to the nursing center. For discharge, her central line had to be removed. On March 19, 2017, the discharge nurse placed Della in the Trendelenburg position,[7] followed protocol, and removed the central line without complication. Della ultimately departed OSH on March 29, 2012.

¶6.    On May 18, 2012, the Sumralls filed a medical-malpractice suit against Singing River. The complaint alleged that Nurse Steele was "substandard and negligent" in removing the first central line, which caused an air embolus, respiratory arrest, and anoxic brain damage. The complaint also alleged that Singing River was vicariously liable for Nurse Steele's actions.

## II.    *Sumrall I*

¶7.    After a bench trial, this Court held in *Sumrall I* that the circuit court abused its discretion by allowing Dr. Corder to testify "inconsistent with, outside of, and beyond his designation." *Sumrall I*, 189 So. 3d at 669 (¶29). According to this Court, the circuit court's ruling that there was no applicable standard of care with regard to patient positioning during

---

[7] The Trendelenburg position is defined as "a supine [position] in which the feet are higher than the head." PDR Medical Dictionary 1545 (3d ed. 2006).

4

the removal of a central line was against the "overwhelming weight of the evidence." *Id.* at 670 (¶30). In addition, this Court held that Dr. Corder testified outside the scope of his designation by stating that Della suffered from a stroke. *Id.* at 669 (¶28). Because of those errors, this Court reversed and remanded the case further proceedings.[8] *Id.* at 670 (¶32).

### III. *Sumrall II* Trial

¶8. A second bench trial occurred on May 1, 2017, in the Jackson County Circuit Court.[9] The parties submitted the first trial's transcript into the record and re-introduced all of the exhibits. The parties also agreed to redact Dr. Corder's testimony from the record to comply with the findings of this Court in *Sumrall I*. Dr. Corder was called to re-testify.[10] The following trial testimony, from *Sumrall I* and *Sumrall II*, is now before this Court:

---

[8] Judge Virginia Carlton concurred in part and dissented in part. Judge Carlton agreed with the majority regarding reversal but opined that liability should have been rendered because (1) the circuit court erred by concluding that no duty was owed to Della, and (2) Nurse Steele had testified outside the scope of her nursing expertise. *Sumrall I*, 189 So. 3d at 670-73 (¶¶33-39) (Carlton, J., concurring in part and dissenting in part).

Judge Jack Wilson, joined by Judge David Ishee, dissented. Judge Wilson agreed that the circuit court abused its discretion by allowing Dr. Corder to testify in a manner inconsistent with his pretrial disclosures and that there was insufficient evidence to support the circuit court's findings to the extent that the court relied on Dr. Corder's undisclosed opinions. However, Judge Wilson concluded that the circuit court made additional findings that did not depend on Dr. Corder's undisclosed opinions and that were independently sufficient to support the judgment. *Id.* at 673-74 (¶¶40-43) (Wilson, J., dissenting).

[9] The *Sumrall I* bench trial was held on December 9-11, 2013. During the first trial, the Sumralls called six witnesses, and Singing River called three witnesses. The first trial's transcript, except Dr. Corder's testimony, was re-introduced at the second trial, along with all of the exhibits.

[10] The parties' briefs indicate that Dr. Corder's testimony was redacted from the record "by agreement of the parties."

### A. The Sumralls' Case-in-Chief

¶9. The Sumralls presented two expert witnesses at the *Sumrall I* trial. Dr. Lidgia Vives was tendered as an expert in the field of vascular neurology. Nurse Crystal Keller was tendered as an expert in the field of nursing. Both experts were offered to present evidence about the standard of care during central line removal. The experts testified that under the generally accepted standard of care for central line removal, the nurse should (1) educate the patient about the procedure; (2) place the patient in the Trendelenburg position; (3) instruct the patient to hold his or her breath and bear down (the "Valsalva" maneuver[11]); (4) place pressure on removal site with gauze; and (5) remove the catheter and continue to hold pressure for approximately five minutes. According to Dr. Vives, Nurse Steele breached the standard of care by not putting Della into the Trendelenburg or supine position while removing the central line. Dr. Vives further concluded that Della suffered from an air embolism as a result of the removal. According to Nurse Keller, Nurse Steele deviated from the standard of care because she failed to "adequately assess" whether Della could tolerate the Trendelenburg position, "adequately position" Della, and "adequately educate" Della on the procedure. Both experts testified on cross-examination that if a hypothetical patient were unable to tolerate the Trendelenburg position (i.e., difficulty breathing in that position or intracranial pressure), then a position other than Trendelenburg (i.e., a position the patient could tolerate) would be acceptable during the removal of a central line. They also testified

---

[11] The Valsalva maneuver, which increases intrathoracic pressure, involves "any forced expiratory effort ('strain') against a closed airway, whether at the nose and mouth or at the glottis." PDR Medical Dictionary 1151 (3d ed. 2006).

6

that there were indications that showed Della could tolerate the Trendelenburg position on February 29, 2012. This was based in part on the fact that Nurse Jenna Blaine was subsequently able to place Della in the Trendelenburg position on March 19, 2012.

¶10. Nurse Blaine also testified at the first trial. Nurse Blaine was a registered nurse who was assigned to Della after the removal of the first central line. She testified that she removed a second central line from Della's left subclavian vein on March 19, 2012. When asked about patient positioning, Nurse Blaine testified that she placed Della in the Trendelenburg position. According to Nurse Blaine, Della was able to tolerate the Trendelenburg position on that day. She further testified that if Della could not have tolerated that position, she would have placed Della in a supine position or "raised the head of the bed . . . until [Della] could [have] tolerate[d] it."

¶11. Della's daughters, Nina Musgrove and Tina Danley, also testified. Both daughters testified as to their mother's physical well-being prior to and after the February 29 incident. Specifically, Musgrove testified that she was in the hospital room at the time Nurse Steele removed the central line. According to Musgrove, her mother was sitting "straight up" at the time the catheter was removed.

¶12. The Sumralls' final witness at the first trial was Roy Sumrall. Roy testified about his relationship with Della and her health following the incident. In addition, Roy testified about a subsequent hospital trip that he and Della took in July 2012. During that visit, Della had another central line inserted. The next month, Della was ordered to be discharged. Roy testified that a doctor removed the central line while Della was in the Trendelenburg

7

position.[12]

¶13.    The Sumralls also introduced the sworn depositions of Dr. John Weldon, a hospitalist and full-time employee of Singing River; Dr. Frank Martin, the Medical Director of the Ocean Springs Nursing Center;[13] and Nurse Steele.

### B.    The Defense's Case-in-Chief

¶14.    Singing River called Nurse Steele as its first witness at the *Sumrall I* trial. Nurse Steele testified about her recollection of the events that occurred on February 29, 2012. According to Nurse Steele, she informed Della about removing her central line. She then positioned Della somewhere between thirty and forty-five degrees, applied pressure to the insertion site, and instructed Della to bear down and hold. The central line was removed, and Nurse Steele stated that she continued to hold pressure on the site until Della lost consciousness. Nurse Steele testified that Della had trouble lying flat in the days prior to removal. According to Nurse Steele, Della had reiterated her inability to breathe in the supine position on the day the line was removed.

¶15.    Singing River's second witness at the *Sumrall I* trial was Dr. Corder, an expert witness. As discussed, his testimony was redacted from the record to comply with the findings of *Sumrall I*. Dr. Corder was called to re-testify in *Sumrall II*. Dr. Corder was tendered as an expert in the field of internal medicine and anesthesiology. Dr. Corder testified that as an anesthesiologist and internist, he routinely placed and removed central

---

[12] Roy did not know the doctor's name.

[13] Dr. Martin provided on-going care to Della after her discharge from OSH.

lines. He also testified that he placed a central line one day prior to re-offering his testimony at trial. Dr. Corder stated that he was familiar with the policies and procedures with respect to the insertion of central lines and the removal of central lines. He then testified to Della's medical history and co-morbidities. After, Dr. Corder testified that he disagreed with Dr. Vives that Della suffered from air embolus. The circuit court sustained an objection regarding the reason why Dr. Corder disagreed with Dr. Vives. According to the circuit court, Singing River's counsel had not disclosed such testimony. Dr. Corder then explained the process of removing a central line. It reflected the same process given by Dr. Vives. Dr. Corder testified that Nurse Steele's positioning of Della at the time of removal was appropriate. According to Dr. Corder, Della's positioning at the time Nurse Steele removed the central line was "consistent with what [he] suspect[ed] . . . her clinical conditions [were] at that time." The Sumralls' attorney did not cross-examine Dr. Corder, and his testimony concluded the second trial.

¶16. Singing River's third witness at the first trial was Dr. Dvorak, Della's attending physician, who had removed Della's gallbladder and ordered her discharge. Dr. Dvorak testified that he thought it was unlikely that Della suffered from a venous air embolus because the size of the catheter was "very small."[14] In addition, he and other hospital personnel "never saw any evidence" of an air embolus. According to Dr. Dvorak, Della may have experienced sudden cardiac arrest, a stroke, or a vagal episode[15] when the central line

---

[14] The catheter was a 7-French triple-lumen catheter.

[15] Dr. Dvorak testified that a vagal episode occurs when "the heart rate pressure slows down and the blood pressure becomes low."

was removed, as opposed to an air embolus. At the conclusion of his testimony, the defense rested.

¶17. On July 26, 2017, the *Sumrall II* circuit court entered its findings of fact and conclusions of law. In the findings of fact, the circuit court determined, in part:

> All of the facts and evidence presented to the [c]ourt clearly establish the standard of care to be: (1) the nurse should educate the patient about the procedure; (2) place the patient in the Trendelenburg position, which is described as having the patient in a supine position where the site of the central line insertion is below the heart; (3) have the patient take a deep breath, hold and bear down (the [V]alsalva maneuver); (4) then, at removal, place gauze with pressure at the removal site. The expert testimony and facts have established that one of the steps in the standard of care is to place the patient in the Trendelenb[u]rg position. The facts also establish, however, that such a standard would not be absolute, and under the right circumstances, a position other than Trendelenb[u]rg is acceptable. Therefore, even though Trendelenb[u]rg is the standard, the intolerance of the plaintiff to that position would allow for deviation from the standard without violation of the standard.

In the conclusions of law, the circuit court ruled, in part:

> The central question at hand, besides the precise position of the plaintiff at the time of the central line removal is the proper positioning of a patient for the purpose of central line removal. In other words, there is no question that the plaintiff claims improper removal of the central line by Nurse Steele due to the alleged improper positioning of the plaintiff during the removal process. It is the plaintiff's burden to prove the applicable standard of nursing care with regard to positioning during central line removal. Furthermore, the plaintiff must show that the defendant breached the applicable standard of care in relation to any exceptions inherent in the applicable standard of care. As stated in the Findings of Fact above, the plaintiff proved the standard of nursing care for the removal of a central line that would apply to the procedure performed by Nurse Steele here is the four-part procedure discussed above. The part of the standard at issue is whether Nurse Steele violated the standard of care by not placing plaintiff in the Trendelenb[u]rg position before removing the central line. The facts and evidence also showed the Trendelenb[u]rg method allowed for variations, even allowing for patients to not be reclined, depending on the patient's tolerance as such the plaintiff firmly established the duty was owed to comply with the standard of care.

10

While the plaintiff has offered sufficient proof of a standard of care, the plaintiff would next have to prove a breach of that standard. Here, based upon facts surrounding the medical condition of the plaintiff, she was unable to tolerate the Trendelenb[u]rg position. The evidence, and even testimony of plaintiff's own experts, supports the fact that a position other than Trendelenb[u]rg is acceptable under such circumstances. The facts and evidence further shows the patient was within the exceptions of the applicable standard of care and Nurse Steele complied with the appropriate standard in regard to those exceptions. . . . [T]herefore, there is no breach of the standard of care.

The Sumralls filed their second notice of appeal on August 24, 2018.

## DISCUSSION

¶18.    On appeal, the Sumralls claim that (I) Dr. Corder was not qualified to testify as to the standard of care; (II) Dr. Corder's testimony was not consistent with his pretrial disclosures; (III) the circuit court's findings of fact and conclusions of law are against the overwhelming weight of the evidence; (IV) the circuit court did not follow the remand directives of *Sumrall I*; and (V) there was cumulative error.

### I.    Expert-Witness Qualification

¶19.    The Sumralls argue that the circuit court abused its discretion by ruling that Dr. Corder, an anesthesiologist and internist, could testify as to the standard of care for removing central lines. Dr. Corder was allowed to testify as an expert in the field of anesthesiology and internal medicine and offer opinions regarding Della's medical records, causation, and whether Nurse Steele deviated from the applicable standard of care.

¶20.    The standard of review for the admission or exclusion of expert testimony is abuse of discretion. *Kronfol v. Johnson*, 283 So. 3d 1162, 1173 (¶22) (Miss. Ct. App. 2019) (citing *Patterson v. Tibbs*, 60 So. 3d 742, 748 (¶19) (Miss. 2011)), *cert. denied*, 283 So. 3d 733

(Miss. 2019). "Absent abuse of discretion, a judge's determination as to the qualifications of an expert witness will remain undisturbed on appeal." *Hubbard v. Wansley*, 954 So. 2d 951, 956 (¶11) (Miss. 2007). "It is generally not required that an expert testifying in a medical malpractice case be of the same specialty as the doctor about whom the expert is testifying." *Id.* at 957 (¶13). However, the expert witness must demonstrate "[s]atisfactory familiarity with the specialty of the defendant doctor" before the witness will be permitted to testify and offer opinions "as to the standard of care owed to the plaintiff patient." *Id.*

¶21. The issue was whether Dr. Corder was qualified to testify as to the "nursing standard of care" for removing central lines. According to the Sumralls, Dr. Corder was not "tendered [or] qualified as an expert in [the] nursing standard of care . . . ." We note that this underlying issue was previously raised in *Sumrall I*. This Court addressed the matter by stating:

> Here, we are concerned with the second step [in the standard of care], i.e., the proper positioning of the patient. We also note that there was testimony that the removal of a central line may be done by both nurses and doctors. Thus, there was no testimony that the standard of care for the removal of a central line would be different depending on the type of medical profession. So we reject the allegation that Singing River failed to present evidence of a separate nursing standard of care. There was absolutely no evidence that a doctor or a nurse would remove a central line differently.

*Sumrall I*, 189 So. 3d at 666 (¶14).

¶22. Dr. Corder was qualified to testify to the applicable standard of care. As mentioned in *Sumrall I*, the record before us is devoid of any evidence showing that a medical doctor would remove a patient's central line differently than a registered nurse. The Sumralls' expert, Dr. Vives, stated in her deposition that the standard of care for nurses and physicians

12

is the same. The record shows that prior to trial, the Sumralls made a similar argument—that a medical doctor is qualified to testify to the applicable nursing standard of care—in a response to Singing River's motion to exclude Dr. Vives. In that response, the Sumralls claimed that Dr. Vives was qualified to testify to the nursing standard of care for removing a central line although she was a medical doctor because of her knowledge and familiarity with relevant medical literature, the procedure, and because "the standards for central line removal are the same for doctors and nurses."

¶23. We find that Dr. Corder demonstrated "[s]atisfactory familiarity" with the procedure required to remove a patient's central line. *Hubbard*, 954 So. 2d at 957 (¶13). Dr. Corder testified that he routinely placed and removed central lines. He also stated that he had removed a central line the day before giving his trial testimony. Absent contrary evidence in the record, we note that there may be some limited instances where the standard of care applicable to medical doctors is the same standard of care applicable to nurses. *Cf. Delta Reg'l Med. Ctr. v. Venton*, 964 So. 2d 500, 505 (¶¶9-12) (Miss. 2007) (receiving expert testimony from both a medical doctor and a registered nurse about the applicable standard of care in prevention of decubitus ulcers or bedsores). Here, the record is without evidence showing that the standard of care for removing central lines differs between doctors and nurses. Finally, Dr. Corder did not offer a standard of care different from the standard of care presented by Dr. Vives or Nurse Keller. Instead, Dr. Corder agreed with Dr. Vives and Nurse Keller about the standard of care but disagreed on whether Nurse Steele deviated from that standard. For these reasons, we find that circuit court did not abuse its discretion by

13

finding that Dr. Corder was qualified to testify to the standard of care for removing a patient's central line.

## II. Expert-Witness Designation

¶24. The Sumralls also argue that Dr. Corder's expert testimony was not consistent with his pretrial disclosures. Similar to expert qualifications, the standard of review is abuse of discretion. *Kronfol*, 283 So. 3d at 1173 (¶22).

¶25. Our rules of civil procedure require a party, upon request, to disclose the identity of each person expected to be called as an expert witness at trial, "the subject matter on which the expert is expected to testify," "the substance of the facts and opinions," and "a summary of the grounds for each opinion[.]" M.R.C.P. 26(b)(4)(A)(i)-(ii). As noted in *Sumrall I*, our supreme court has held:

> Compliance with the rule involves a fact-intensive comparison between the subject matter contained in discovery responses and the subject matter of the testimony given by the expert at trial. [*Buskirk v. Elliott*, 856 So. 2d 255, 264 (¶25) (Miss. 2003)]. This Court has found discovery violations and subsequent exclusion of expert testimony to be proper when the experts testified as to a subject matter different from the subject matter contained in discovery responses. *See, e.g.*, *Colthrap v. Canesale*, 733 So. 2d 780, 786 [(¶27)] (Miss. 1999) (trial court committed reversible error by admitting expert testimony supporting additional theory of plaintiff's injury not revealed during discovery); *T.K. Stanley Inc. v. Cason*, 614 So. 2d 942, 950-51 (Miss. 1992) (trial court erred in admitting expert testimony regarding permanent disability, as it was a separate subject matter from causation). However, this Court has established that "where the stated subject matter in the response necessarily includes the subject matter testified to at trial, it is an abuse of discretion to exclude the expert's testimony." *Buskirk*, 856 So. 2d at 264 [(¶25)].

*Sumrall I*, 189 So. 3d at 668 (¶23) (quoting *Canadian Nat'l/Ill. Cent. R.R. v. Hall*, 953 So. 2d 1084, 1097 (¶44) (Miss. 2007)).

14

¶26. We start by comparing the subject matter of Dr. Corder's designation and the subject matter of his trial testimony. Prior to trial, Singing River disclosed in its "Second Amended Designation" that Dr. Corder would testify that Nurse Steele did not deviate from the standard of care while removing Della's central line. The designation stated that Dr. Corder's opinions would "contradict any opinions on standard of care and/or causation as stated" by Dr. Vives and Nurse Keller. It also explained that his opinions were based in part on the medical records and documents, deposition transcripts, his experience, his training, his educational background, relevant medical literature, and the pleadings filed in the case.

¶27. Upon careful review of Dr. Corder's trial testimony, the transcript shows that Dr. Corder testified to the same subject matter as his disclosure. Dr. Corder testified that he was familiar with central lines and the required procedures for placing and removing central lines. He testified that he had reviewed the Sumralls' complaint, medical records, the (pretrial) disclosures, witness depositions, various institutions' central line policies and procedures, additional physicians' records, the nursing home's records, and Dr. Vives's and Nurse Keller's trial testimonies. He also explained the manner in which Nurse Steele removed Della's central line and testified that her conduct was appropriate under the applicable standard of care, especially given Della's medical history and physical well-being at the time it was removed.

¶28. In their reply brief, the Sumralls claim that the circuit court's ruling contradicts our holding in *King v. Singing River Health System*, 158 So. 3d 318, 323 (¶23) (Miss. Ct. App. 2014). In that case, this Court affirmed the trial court's decision to exclude the plaintiffs'

15

expert, a neurologist who had extensive experience treating strokes, because the expert's opinions were not based on reliable data. *Id.* at 328-29 (¶45). The trial court in *King* ruled that the neurologist's opinions were unreliable because they lacked support in relevant medical literature. *Id.* at 324 (¶28). The plaintiff argued that although the neurologist expert testified at odds with the medical literature, his opinions overcame the conflict by reference to his own experience as a doctor. *Id.* at 326 (¶35). This Court disagreed, holding that "where a theory has been studied in the medical literature and an expert's opinion is challenged for being contrary to the medical literature, there must be some support in the medical literature for a medical expert's opinion or some basis for believing that the medical literature is wrong." *Id.* at (¶36).

¶29. We find *King* distinguishable from the instant case. In *King*, the plaintiff's expert's testimony was inconsistent with the relevant medical literature. This Court held that it was improper for the neurologist to overcome that inconsistency by strictly relying on his personal experience as a doctor. Here, Dr. Corder agreed with the Sumralls' experts regarding the applicable standard of care. As to patient positioning, the record shows that the relevant medical literature demonstrates that a patient may be situated in a position other than Trendelenburg if the patient cannot tolerate that position. As such, Dr. Corder's opinion was not at odds with the relevant medical literature in this case.

¶30. On these facts, we cannot say that Dr. Corder testified outside the subject matter for which he was designated by Singing River. "[D]iscovery responses regarding experts do not, indeed cannot include everything that an expert witness will state at trial." *Walker v. Gann*,

16

955 So. 2d 920, 929 (¶24) (Miss. Ct. App. 2007) (internal quotation marks omitted) (quoting *Peterson v. Ladner*, 785 So. 2d 290, 295 (¶20) (Miss. Ct. App. 2000)). As required by Rule 26(b)(4)(A), Singing River's pretrial disclosure identified Dr. Corder as an expert witness, gave notice of the subject matter in which he was to testify, stated his opinions and bases for those opinions, and a summary for how he came to those conclusions. Therefore, we find that the circuit court was within its discretion to conclude that Dr. Corder was properly designated.

### III. Weight of the Evidence

¶31. In their third assignment of error, the Sumralls contend the circuit court's findings of fact and conclusions of law were against the overwhelming weight of the evidence. Specifically, the Sumralls argue that it was error for the circuit court to conclude that Della was unable to tolerate the Trendelenburg position.

¶32. "In reviewing the decision of a trial judge sitting without a jury, this Court may only reverse when the findings of the trial judge are manifestly wrong or clearly erroneous." *Greenwood Leflore Hosp. v. Bennett*, 276 So. 3d 1174, 1178 (¶10) (Miss. Ct. App. 2018) (quoting *Sacks v. Necaise*, 991 So. 2d 615, 619 (¶6) (Miss. Ct. App. 2007), *cert. denied*, 258 So. 3d 287 (Miss. 2018)). "A circuit court judge sitting without a jury is accorded the same deference with regard to his findings as a chancellor, and his findings are safe on appeal where they are support by substantial, credible, and reasonable evidence." *Sumrall I*, 189 So. 3d at 664 (¶10) (internal quotation marks omitted) (quoting *City of Jackson v. Brister*, 838 So. 2d 274, 277-78 (¶13) (Miss. 2003)). Further, we must "recognize that the trial judge,

17

sitting in a bench trial as the trier of fact, has the sole authority for determining the credibility of the witnesses." *City of Jackson v. Lipsey*, 834 So. 2d 687, 691 (¶14) (Miss. 2003).

¶33. A plaintiff seeking to recover for medical malpractice "must show by a preponderance of the evidence that the defendant had a legal duty, that he or she breached that duty by failing to conform to the required standard of care, that the breach proximately caused the injury, and that damages were suffered." *Hill v. Warden*, 796 So. 2d 276, 280 (¶10) (Miss. Ct. App. 2001). The plaintiff must also show, by expert testimony, that the physician or medical personnel violated the applicable standard of care. *See Palmer v. Biloxi Reg'l Med. Ctr. Inc.*, 564 So. 2d 1346, 1335 (Miss. 1990).

¶34. In ruling from the bench, the circuit court found that the Sumralls "proved the standard of nursing care for the removal of a central line." The court stated:

> All of the facts and evidence presented to the [trial court] clearly establish the standard of care to be: (1) the nurse should educate the patient about the procedure; (2) place the patient in the Trendelenb[u]rg position, which is described as having the patient in a supine position where the site of the central line insertion is below the heart; (3) have the patient take a deep breath, hold and bear down (the [V]alsalva maneuver); (4), then, at removal, place gauze with pressure at the removal site. The expert testimony and facts have established that one of the steps in the standard of care is to place the patient in the Trendelenb[u]rg position. The facts also establish, however, that such a standard would not be absolute, and under the right circumstances, a position other than Trendelenb[u]rg is acceptable. Therefore, even though Trendelenb[u]rg is the standard, the intolerance of the plaintiff to that position would allow for deviation from the standard without violation of the standard.

After reviewing the parties' briefs, it appears neither party disputes the circuit court's standard of care for removing a central line as articulated by the circuit court. Rather, the Sumralls argue that Nurse Steele (and Singing River) breached the standard of care by not

18

properly positioning Della in the Trendelenburg position. In that regard, the circuit court found:

> While the [Sumralls] ha[ve] offered sufficient proof of a standard of care, the [Sumralls] would next have to prove a breach of that standard. Here, based upon facts surrounding the medical condition of [Della], she was unable to tolerate the Trendelenb[u]rg position. The evidence, and even testimony of [the Sumralls'] own experts, supports the fact that a position other than Trendelenb[u]rg is acceptable under such circumstances. The facts and evidence further shows the patient was within the exceptions of the applicable standard of care and Nurse Steele complied with the appropriate standard in regard to those exceptions. . . . [T]herefore, there is no breach of the standard of care.

¶35. At trial, the Sumralls' first expert, Dr. Vives, testified that the care rendered to Della fell below the standard of care because Nurse Steele failed to place Della in either the Trendelenburg or a supine position during removal of the central line. Dr. Vives based her testimony in part on a subsequent procedure, which this Court addresses later in this section. However, Dr. Vives testified on cross-examination that a collapsed lung and pneumonia could make it difficult for a patient to breathe. And she testified that it is "acceptable" to place a patient in a position above supine if the patient cannot tolerate either the Trendelenburg or a supine position. Dr. Vives conceded that she witnessed a previous patient, who was educated of the risk, having a central line removed while in a position above supine.

¶36. The Sumralls' second expert, Nurse Keller, testified that Nurse Steele breached the standard of care because "she failed to adequately position [Della] properly." Similar to Dr. Vives, Nurse Keller testified on cross-examination that a patient who cannot tolerate either Trendelenburg or a supine position, should be placed in a position "as much as they can

19

tolerate."

¶37.    In response to Dr. Vives and Nurse Keller, Dr. Corder, the expert for Singing River, testified that Nurse Steele acted appropriately and met the standard of care in removing Della's central line.  Dr. Corder stated that it was reasonable to believe that Della could not lie flat on her back, especially given the recent, large upper-abdominal procedure she endured, her history of COPD, bad lung function, chronic interstitial disease, partially collapsed lung, chronic bronchitis, and pneumonia.  In regard to the abdominal procedure, Dr. Corder noted that Dr. Dvorak could not perform the surgery laparoscopically.  Instead, Della's physicians had to "open" her abdominal section.  Della's doctors noted in the medical records that Della's gallbladder was "auto amputated," which meant her gallbladder was necrotic.  Dr. Corder also stated that generally abdominal procedures such as gallbladder surgery have a "marked effect" on pulmonary physiology.  He explained that since Della suffered from preexisting pulmonary disease, it was not unreasonable to think that Della had a hard time lying flat on her back.  In his opinion, Dr. Corder found that placing Della between thirty and forty-five degrees was consistent with her clinical conditions at the time of removal.  He stated that a doctor or nurse should not lay someone flat on his or her back to perform the removal procedure if the patient cannot tolerate that position because it would "induce panic" and likely cause the patient to become "short of breath."

¶38.    As mentioned above, the Sumralls and their experts contend that Della could tolerate the Trendelenburg position because she was placed in that position after Nurse Steele removed the first central line.  The record indicates that following the February 29 incident,

a second central line was inserted into Della. Nearly three weeks later on March 19, Nurse Blaine was ordered to remove that line. The record shows that Nurse Blaine placed Della in the Trendelenburg position and removed her central line without complication.

¶39. But the record further shows that Della's overall condition improved from the removal of the first central line on February 29 to the removal of the second central line on March 19. Della suffered from "right upper lobe atelectasis," or a partially collapsed lung, at the time Nurse Steele removed the central line on February 29. On February 25, or four days prior to the removal, Della's radiology report indicated "chronic volume loss in the right upper lobe" that appeared to be "more prominent over the past 24 hours." On March 3, 2012, or three days after the removal, Della's physician documented no change in her partially collapsed lung, as well as hyperinflation in the left lung. On March 4, 2012, Della's condition started to show improved "atelectatic" changes in the right upper lobe of her lung. Over the following two weeks, Dr. John Weldon noted overall improvement in Della's physical condition. On March 16, Dr. Weldon detailed, "Ms. Sumrall really looks about as good as I have seen her all week. She is not looking overly sedated. She is a bit more interactive. She denies chest pain or shortness of breath." Three days later after that progress report, Nurse Blaine removed Della's second central line.

¶40. The testimony and evidence at trial supports a finding that Nurse Steele (and Singing River) did not breach the standard of care by not positioning Della in the Trendelenburg position. Nurse Steele was charged with caring for Della prior to her gallbladder surgery and until the date of discharge on February 29. While Nurse Steele cared for Della, Nurse Steele

21

noticed Della had trouble ambulating, breathing, and was requiring oxygen. In her deposition testimony, Nurse Steele recounted a specific incident that occurred prior to removal in which she and other nurses were assisting Della with getting into bed. Nurse Steele stated that Della was unable to lie flat on her back, so she and the other nurses "angled" her body in order to lift her into the bed. Additionally, Nurse Steele testified that she only remembered one occasion in which Della was lying in the supine position prior to removal. At trial, Nurse Steele reiterated that Della had difficulty lying flat on her back. According to Nurse Steele, Della expressed difficulty with lying down on the day the central line was removed.

¶41. According to Dr. Vives, doctors and nurses employ some subjectivity in determining whether a patient can tolerate a certain position. Nurse Keller agreed with Dr. Vives and added that objective indicators also play a role, such as the patient's respiratory rate, heart rate, and blood pressure.

¶42. The record is replete with testimony and other evidence supporting the circuit court's decision that Della could not tolerate the Trendelenburg position on the day of removal. As mentioned above, Della suffered from a wide-ranging medical history that included numerous co-morbodities that affected her respiratory system. Della endured, among other things, bouts of pneumonia, COPD, diabetes, asthma, sleep apnea, kidney disease, arthritis, coronary artery disease, a partially collapsed lung, and high blood pressure. Further, there is supporting evidence that shows that Della was having difficulty lying flat during the days leading up to removal and on the day the central line was removed. There is also sufficient evidence demonstrating that Della's overall physical condition improved by the time Nurse

22

Blaine removed Della's second central line.

¶43. At trial, the circuit court was tasked with determining the weight and credibility of the evidence and resolving the conflicting evidence. The circuit court found Dr. Corder to be credible, and his testimony gave credence to Singing River's theory that Della could not tolerate the Tredelenburg position. *See Lipsey*, 834 So. 2d at 691 (¶14). Upon review, this Court "must accept[] that evidence which supports or reasonably tends to support the findings of fact made below, together will all reasoning inferences which may be drawn therefrom and which favor the lower court's findings of fact." *Univ. Med. Ctr. v. Martin*, 994 So. 2d 740, 747 (¶26) (Miss. 2008) (internal quotation marks omitted). In doing so, it is clear that the circuit court did not manifestly err in this case. *Bennett*, 276 So. 3d at 1178 (¶10). "While enough evidence exists in the record such that reasonable minds may disagree, substantial, credible, and reasonable evidence exists to support the trial court's judgment" in favor of Singing River. *Tabitha Prayer v. Greenwood Leflore Hosp.*, 183 So. 3d 877, 884 (¶23) (Miss. 2016).

## IV. Compliance with Directives on Remand

¶44. The Sumralls claim that the circuit court failed to follow this Court's mandate on remand. It is well settled that "[t]he mandate issued by an appellate court is binding on the trial court on remand." *G.B. Boots Smith Corp. v. Cobb*, 911 So. 2d 421, 423 (¶6) (Miss. 2005) (citing *Dunn v. Dunn*, 695 So. 2d 1152, 1155 (Miss. 1997)). "Where [an appellate court] has already decided a specific issue in a case on a prior appeal, the trial court has been found to be in error where, on remand, it has refused to follow [the appellate court's] opinion

23

and directions." *Nelson v. Bonner*, 13 So. 3d 880, 883 (¶5) (Miss. Ct. App. 2009) (citing *Dunn*, 695 So. 2d at 1155).

¶45.   In *Sumrall I*, this Court held:

> Therefore, we find that the trial court abused its discretion in allowing Dr. Corder to testify inconsistent with, outside of, and beyond his designation. First, we find that the trial court's finding that "as a matter of fact . . . there is no recognized applicable standard of nursing care with regard to patient positioning during the removal of a central line" and "without an applicable standard of care, there can be no breach of such," was not supported by substantial credible, and reasonable evidence. Second, we find that the trial court's finding that "[i]t was either an air embolism or perhaps a cardiac event along with a stroke" was not supported by substantial, credible, and reasonable evidence.
>
> Further, we find that the Sumralls offered expert testimony, support by extensive medical literature, to indicate that there was a standard of care for a nurse to remove a central line. We recognize that the standard of care may include some variation in proper positioning of the patient depending upon her condition. However, the trial court's finding that there is no standard of care is against the overwhelming weight of the evidence and must be reversed. Hence, we reverse the trial court's judgment and remand for further proceedings consistent with this opinion.

*Sumrall I*, 189 So. 3d at 669-70 (¶¶29-30).

¶46.   The case was re-tried on May 1, 2017.  By agreement, the parties submitted the first trial's transcript into the record.  The parties also reintroduced all of the exhibits from the first trial.  Furthermore, upon remand, the parties redacted Dr. Corder's trial testimony to comport with this Court's instruction.  Dr. Corder was then called to re-testify.

¶47.   Dr. Corder was tendered as an expert in the field of internal medicine and anaesthesiology.  As discussed, Dr. Corder testified that he disagreed with Dr. Vives and Nurse Keller.  He also testified that he disagreed that Della suffered from air embolus.  A

24

subsequent objection was sustained by the circuit court regarding the reason why Dr. Corder disagreed with Dr. Vives. According to the circuit court, such testimony was not disclosed by Singing River's counsel. Dr. Corder also testified that Della suffered from chronic atelectasis, or collapsed lung, of the right upper lobe. In addition, Dr. Corder testified that Della suffered from other breathing complications. According to Dr. Corder, Della's positioning at the time Nurse Steele removed the central line was "consistent with what [he] suspect[ed] . . . her clinical conditions [were] at that time." The Sumralls' attorney did not ask any questions on cross-examination. And no questions were asked on redirect. Dr. Corder's testimony concluded the second trial.

¶48. After the second trial, the circuit court entered its findings of fact and conclusions of law on July 26, 2017. The findings of fact read, in part:

> All of the facts and evidence presented to the Court clearly establish the standard of care to be: (1) the nurse should educate the patient about the procedure; (2) place the patient in the Trendelenburg position, which is described as having the patient in a supine position where the site of the central line insertion is below the heart; (3) have the patient take a deep breath, hold and bear down (the [V]alsalva maneuver); (4) then, at removal, place gauze with pressure at the removal site. The expert testimony and facts have established that one of the steps in the standard of care is to place the patient in the Trendelenb[u]rg position. The facts also establish, however, that such a standard would not be absolute, and under the right circumstances, a position other than Trendelenb[u]rg is acceptable. Therefore, even though Trendelenb[u]rg is the standard, the intolerance of the plaintiff to that position would allow for deviation from the standard without violation of the standard.

In addition, the conclusions of law read, in part:

> The central question at hand, besides the precise position of the plaintiff at the time of the central line removal is the proper positioning of a patient for the purpose of central line removal. In other words, there is no question that the plaintiff claims improper removal of the central line by Nurse Steele due to the

25

alleged improper positioning of the plaintiff during the removal process. It is the plaintiff's burden to prove the applicable standard of nursing care with regard to positioning during central line removal. Furthermore, the plaintiff must show that the defendant breached the applicable standard of care in relation to any exceptions inherent in the applicable standard of care. As stated in the Findings of Fact above, the plaintiff proved the standard of nursing care for the removal of a central line that would apply to the procedure performed by Nurse Steele here is the four-part procedure discussed above. The part of the standard at issue is whether Nurse Steele violated the standard of care by not placing plaintiff in the Trendelenb[u]rg position before removing the central line. The facts and evidence also showed the Trendelenb[u]rg method allowed for variations, even allowing for patients to not be reclined, depending on the patient's tolerance as such the plaintiff firmly established the duty was owed to comply with the standard of care.

While the plaintiff has offered sufficient proof of a standard of care, the plaintiff would next have to prove a breach of that standard. Here, based upon facts surrounding the medical condition of the plaintiff, she was unable to tolerate the [sic] position. The evidence, and even testimony of plaintiff's own experts, supports the fact that a position other than Trendelenb[u]rg is acceptable under such circumstances. The facts and evidence further shows the patient was within the exceptions of the applicable standard of care and Nurse Steele complied with the appropriate standard in regard to those exceptions. . . . [T]herefore, there is no breach of the standard of care.

¶49. After careful review, we find that the circuit court complied with this Court's mandate in *Sumrall I* on remand.

## V. Cumulative Error

¶50. Finally, the Sumralls claim that they were denied a fair trial due to cumulative error. "The cumulative-error doctrine states that multiple errors, which alone may not require reversal, may constitute reversible error if the cumulative effect of the errors resulted in an unfair trial." *Lacoste v. Lacoste*, 197 So. 3d 897, 913 (¶58) (Miss. Ct. App. 2016) (citing *Blake v. Clein*, 903 So. 2d 710, 732 (¶68) (Miss. 2005)).

¶51. In their brief, the Sumralls cite eight errors that they allege together constitute

26

cumulative error.[16]  This exact argument was briefed and brought before this Court in

*Surmall I.*  The *Sumrall I* court provided:

> In addition, we recognize that the Sumralls have also challenged a number of the trial court's discovery and pretrial rulings under the issue they refer to as "cumulative error."  Because we have decided to reverse and remand this case for further proceedings, we find the issues raised in the cumulative-error section are now moot.  *Furthermore, we are of the opinion that the Sumralls have raised these issues only as to the finding of cumulative error and do not ask this Court to reverse the trial court's ruling on each individual issues. Had the Sumralls so intended, they would have provided citations to legal authority and included these as separate issues.*  As a result, we make no ruling as to these separate issues.

*Sumrall I*, 189 So. 3d at 670 (¶31) (emphasis added).  After review, we find that the effect of the alleged errors cited by the Sumralls did not amount to an unfair trial.  Six of the eight alleged errors pertained to pretrial matters.  We find no error within these issues.  The seventh alleged error, whether Dr. Corder was qualified to testify as an expert, was discussed in section (I) of this opinion.  The eighth alleged error, whether the circuit court's decision was against the weight of the evidence, was discussed in section (III).  Therefore, these issues are without merit.

## CONCLUSION

¶52.    In conclusion, we find that the Dr. Corder was properly qualified to testify to the

---

[16] Those errors were: (1) the circuit court "refused to enforce [a] duly served subpoena and notice of deposition"; (2) the circuit court required fact witnesses to be paid a reasonable hourly fee; (3) the circuit court "refused to award . . . attorney's fees"; (4) the circuit court "denied [the Sumralls'] motion in limine as to undisclosed medical opinions"; (5) the circuit court  denied the Sumralls' motion "to exclude [Singing River's] expert opinions"; (6) the circuit court  denied the Sumralls partial summary judgment; (7) the circuit court  permitted Dr. Corder to testify as an expert; and (8) the circuit court's  decision was against the overwhelming weight of the evidence.

standard of care for removing central lines. We also find that his trial testimony was consistent with Singing River's pretrial designation. Upon careful review, we find that there is substantial credible evidence in the record to support the circuit court's finding that Della could not tolerate the Trendelenburg position on the day Nurse Steele removed the first central line. Therefore, the circuit court did not err by finding that Nurse Steele did not deviate from the applicable standard of care. We finally find that the circuit court followed the directives of this Court on remand and that the alleged cumulative errors cited by the Sumralls did not result in an unfair trial. For those reasons, we affirm.

¶53. **AFFIRMED.**

**BARNES, C.J., J. WILSON, P.J., WESTBROOKS, TINDELL, McDONALD, McCARTY AND C. WILSON, JJ., CONCUR. CARLTON, P.J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. LAWRENCE, J., NOT PARTICIPATING.**