# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2014-CA-00440-SCT

*TABITHA PRAYER, FOR AND ON BEHALF OF*
*THE ESTATE AND WRONGFUL DEATH*
*BENEFICIARIES OF JONES TOY, DECEASED*

*v.*

*GREENWOOD LEFLORE HOSPITAL*

| | |
|---|---|
| DATE OF JUDGMENT: | 01/16/2014 |
| TRIAL JUDGE: | HON. W. ASHLEY HINES |
| COURT FROM WHICH APPEALED: | LEFLORE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | WALTER ANDREW NEELY |
| | W. ERIC STRACENER, JR. |
| | JOHN F. HAWKINS |
| ATTORNEYS FOR APPELLEE: | REX MORRIS SHANNON, III |
| | GAYE NELL LOTT CURRIE |
| NATURE OF THE CASE: | CIVIL - WRONGFUL DEATH |
| DISPOSITION: | AFFIRMED - 01/28/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE RANDOLPH, P.J., PIERCE AND KING, JJ.**

**KING, JUSTICE, FOR THE COURT:**

¶1.      In this wrongful death action alleging medical malpractice as the cause of Jones Toy's

brain injury and ultimate death, the Leflore County Circuit Court found for the defendant

hospital after a bench trial.  Because substantial, credible, and reasonable evidence supports

the trial court's judgment, this Court affirms the judgment of the Leflore County Circuit

Court.

## FACTS AND PROCEDURAL HISTORY

¶2.     On September 17, 2008, fifty-four-year-old Jones Toy went to Greenwood Leflore Hospital (GLH) to have the tip of his right index finger amputated in what was intended to be an outpatient procedure.  At the time of his surgery, Toy had multiple health problems, including cardiomyopathy, an internal heart defibrillator, end stage renal failure, and a fistula[1] to assist with his dialysis.  "His gangrenous finger" that was to be amputated "was consistent with his past medical history of heart disease and peripheral vascular disease." Patients with those types of illnesses often "present with necrotic ulcers in their fingers and/or their toes due to poor circulation."  George "Sandy" Weathers, a Certified Nurse Anesthetist (CRNA), completed Toy's pre-anesthesia report, and classified him as ASA 3, and his anesthesia plan was determined to be Monitored Anesthesia Care (MAC), in which the patient is awake, but is given various medicines to make him less aware of the surgery. Before 1:58 p.m., the time at which Toy entered the operating room (OR), Weathers gave him the drugs Fentanyl and Versed.

¶3.     Shortly after Weathers took Toy to the operating room, CRNA Joseph ("Jody") Simcox came to take over Toy's care, and Weathers "reported off" to him.  Simcox made the decision to give Toy a 50 milligram dose of Propofol, using a roller clamp to infuse his IV line so that he could control the rate at which the IV dripped.  The orthopedic surgeon, Dr. Daneca DiPaolo, injected local anesthesia into Toy's finger.  Simcox testified that at that point, Toy jerked.  Thus, he made the decision to give Toy a second dose of propofol exactly as he had given the first dose.  At that point, at about 2:15 p.m., Toy's blood pressure

[1]A fistula is a location where an artery and a vein are connected to provide a dialysis access point with good blood flow.

dropped, which was an expected response to the propofol. In response, Simcox administered

ephedrine and atropine to reverse the blood pressure drop. He also changed his supplemental

oxygen mask connected to a breathing machine to a manual bag with a mask that created a

tight seal around Toy's mouth and nose so that Simcox could manually control and monitor

Toy's breathing. From 2:15 to 2:30 p.m., no blood pressure and no pulse oxygen readings

for Toy were recorded in the OR record. However, carbon dioxide exhalation was recorded

during this time.[2]

¶4.      As the surgery concluded, Weathers entered the OR and noticed that Toy had no blood

pressure reading and no pulse oxygen reading. At that point, he tried to palpate for a pulse

and did not find one. A code was called at 2:29 p.m.[3] Weathers began chest compressions

at 2:31 p.m. and Simcox was attending to Toy's airway at 2:30 p.m. and intubated Toy at

2:32 p.m. Toy was successfully resuscitated at 2:32 p.m. At that juncture, he was transferred

to the ICU and his neurological status was documented as "unresponsive." Toy was

unresponsive except to painful stimuli the entire time he was in the ICU, from September 17,

2008, until his death from heart failure on October 5, 2008. It was agreed that Toy

experienced some sort of anoxic or hypoxic brain injury, but what Prayer and GLH disagree

on is when and how this brain injury occurred.

¶5.      On September 16, 2009, a notice of claim letter was sent to Greenwood Leflore

---

[2]The EKG was also showing a normal sinus rhythm. However, the plaintiff alleges this was pulseless electrical activity from Toy's internal defibrillator.

[3]The times noted are the times written in the Code 99 Record. The testimony was that the times may not be exact, because everyone was focused on the patient in crisis and not on making a perfect record.

Hospital, Leflore County, the City of Greenwood, Dr. DiPaolo, and others involved in Toy's care from September 17, 2008, to October 5, 2008. On March 19, 2010, Tabitha Prayer, Toy's daughter, filed a wrongful death complaint against GLH, the City of Greenwood, Leflore County, and John and Jane Doe defendants. Prayer eventually dismissed the claims against Greenwood and Leflore County. In the complaint, Prayer claimed that CRNA Simcox overdosed Toy with anesthesia drugs, that Toy "aspirated" during the Code 99 (the complaint seems to allege that this caused some loss of neurological function), but that "according to a radiographic exam taken on September 18, 2008, Toy still had neurological function." The complaint further alleged that on September 21, 2008, in the ICU, a nurse

> was conducting a physical examination of Toy when she became suspicious that Toy was not being ventilated. The RN paged the physician on call, Dr. Resik. After approximately twenty-five (25) minutes, an ER physician attended to Mr. Toy and reintubated him.[4] Due to the failure by the Defendants to timely attend to the circumstances, Toy lost all neurological function and was left in a state of anoxic encephalopathy.[5]

¶6. The bench trial in the case began on August 26, 2013. At trial, the plaintiff proceeded on the theory that Toy was overdosed by the CRNA and that he suffered anoxic encephalopathy in the OR because the CRNA failed to timely recognize and treat Toy's cardiac arrest. The plaintiff's theory relied heavily on the lack of blood pressure and pulse oxygen readings in the OR record for the nearly fifteen minute time period from 2:15 p.m. until the code was called at 2:29 p.m. The plaintiff abandoned the theory that the brain injury

---

[4]This incident is found in the nurse's notes.

[5]An anoxic brain injury is one in which the brain has been deprived of oxygen for a period of time significant enough to cause brain damage.

4

occurred on September 21, 2008, in the ICU. The defendant also noted that, in preparation for trial, the plaintiff did not take any depositions whatsoever.

¶7. At trial, the plaintiff put forth several witnesses, including a CRNA expert and an anesthesiologist. Yolanda Toy, Toy's wife, and Prayer both testified that he never communicated meaningfully after his surgery. Rex Allison, the plaintiff's CRNA expert, testified that giving Toy the second dose of propofol "would very likely cause an overdose" based on Toy's medical record and his ASA classification of 3, and that what was done was a breach of the standard of care. He also testified that he believed that Toy was in cardiac arrest at 2:15 p.m. based upon the precipitous drop of blood pressure, and that "according to Advanced Cardiac Life Support (ACLS) guidelines, at that point he had no blood flow through his system and CPR should have been instituted at that point." He opined that one reason that no oxygen saturation reading was obtained during this time period could be because "his blood pressure was too low and he had no circulation." He noted that, according to ACLS guidelines, brain injury occurs in less than five minutes in situations like this.

¶8. Dr. Norman Douglas Packer, an anesthesiologist and former president of Jackson Anesthesia Associates, also testified for the plaintiff. He first testified that GLH failed to appreciate Toy's medical condition. Like Allison, he testified that the standard of care was breached with the dosage of propofol. Dr. Packer opined that

> clearly [Toy] received too much medicine. His blood pressure dropped as a result of receiving too much medicine. Of course he's – his breathing stopped, as we have seen from the previous CRNA expert, and he had a cardiac arrest, and he had no effective blood pressure or circulation for 15 minutes. And that

ultimately led to his death.

He further noted that the EKG electrical activity could be accounted for by Toy's internal cardiac defibrillator. He concluded that the cardiac arrest caused a lack of oxygenated blood flow to the brain, as shown by the failure of blood pressure or pulse oxygen to register, which caused the anoxic brain injury. He opined that CPR should have been administered around 2:17 p.m.

¶9. In addition to the testimony, the medical records in evidence contain some indications that anoxic brain injury was suspected shortly after surgery. Numerous notations in the nurses' notes and various patient assessments in the hours and days shortly after surgery indicate that Toy only responded to painful or "noxious" stimuli, or that he was unresponsive. Notes by one of the consulting physicians indicate that Toy had a cardiac arrest during his surgery and "was thought to have sustained hypoxic brain injury during the episode." Doctors' notes and tests performed from that time period also indicate the possibility that brain injury occurred during, or immediately after, surgery.

¶10. GLH first called Dr. DiPaolo to testify. Dr. DiPaolo noted that Toy's "gangrenous finger was consistent with his past medical history of heart disease and peripheral vascular disease. In [sic] individuals with those type of illnesses are the ones who generally present with necrotic ulcers in their fingers and/or their toes due to poor circulation." Dr. DiPaolo also testified that in this surgery, the doctor must dissect the finger until she gets a bleeding edge "because it's the blood supply that brings the oxygen that gets the wound to heal." She testified that she did indeed dissect Toy's finger until she observed bleeding. She noted that

6

if Toy had been without a pulse for any significant period of time, she would not have been able to obtain bleeding from the finger. She also testified that the actual surgery took about five to ten minutes. Dr. DiPaolo testified that Toy had a fistula in his forearm "which is a type of blood vessel connection that is used for dialysis patients, and what it is is an artery is connected to a vein to allow for a very easily identified pulsation." She stated that a fistula pulses more evidently than a normal pulse, and that as she was completing the procedure, she noticed that the fistula no longer had a pulse. Prior to the end of the procedure, she had not noticed any lack of blood flow to the fistula.

¶11. CRNA Weathers testified next. He noted that certain occurrences can prevent an accurate blood pressure reading, for example, if the patient is moving or if there is a fluctuation in blood pressure, which may explain the lack of blood pressure readings in the OR record. He also testified that it is very common to get no pulse oxygen reading when the blood pressure cuff is on the same arm as the pulse oximeter, because "the tightening of the blood pressure cuff prevents a pulse from reaching the extremity," potentially explaining the lack of pulse oxygen reading in the OR record. Last, in regard to the OR record, he noted that the fifteen minute increment block on the form represents a block of time and what is recorded is just a snapshot. He did admit that he palpated for a pulse as soon as he walked into the OR and immediately began CPR, and that Toy was revived about one minute later.

¶12. CRNA Simcox testified next. He testified that when Dr. DiPaolo stuck Toy with a needle, Toy moved, so Simcox then gave Toy the second dose of propofol. He stated that Toy's breathing slowed and his blood pressure dropped, which was an expected response.

Because he expected this response, Simcox testified that he already had some ephedrine drawn up, which he administered to raise blood pressure. Simcox also testified that at that point, he could determine that Toy was breathing because of the rise and fall of his chest and the fogging of his oxygen mask, but that his breathing did slow, so Simcox "elected to take my mask, which is connected to my breathing machine, and put it on his face, and it's connected to the balloon and bag that you see people squeeze." At that point, Simcox noted that Toy had a tight seal on his mouth and nose and Simcox had his hands on the bag, and could thus better determine whether Toy was breathing, and how deeply. He further testified that when he was mask assisting Toy, Toy was breathing on his own. He mentioned that at one point when he failed to get a blood pressure, Toy was moving his arm purposefully, so he wasn't concerned about the lack of blood pressure since Toy had purposeful movement, an EKG tracing, carbon dioxide output, and was inhaling and exhaling.

¶13.    After Toy's heart rate fell, he gave Toy a dose of atropine to increase heart rate. Simcox also gave Toy a second dose of ephedrine. Simcox testified that at that point, a blood pressure cycle failed to register, Toy's breathing changed dramatically, the surgery was finishing up, and Weathers came into the OR. That was when Weathers palpated for a pulse and found none, and he began chest compressions while Simcox intubated Toy. Simcox testified that after they stabilized Toy and Toy began waking up, Toy began to grab for the intubation tube and got a bit combative. They tried to calm him down and instructed him not to pull the tube out. When asked if he believed that Toy could understand what was being said to him, Simcox replied "Yeah, I think so. You know, we were talking to him. He was

8

clearly agitated. A breathing tube is an offensive mechanism, an instrument. I have no reason to believe he didn't understand us at that point." Simcox testified that Toy did not go ten minutes without breathing, and that the end-tidal carbon dioxide measurements from 2:15 to 2:30 were proof of exhalation.

¶14. Regarding the inconsistencies in the anesthesia record, Simcox testified that he completed some of the anesthesia record after Toy had been transported to the ICU, because he was having to use two hands to care for Toy during the latter portion of the procedure, rather than being able to write on a document. He "conceded that the documentation of paperwork perhaps was neglected. That patient Mr. Toy and his condition was not neglected."

¶15. Dr. Claude Brunson, an anesthesiologist, former chairman of the University of Mississippi Medical Center Department of Anesthesiology, and a board member of the American Society of Anesthesiology, as well as the president of the Mississippi State Medical Association, testified as an expert for GLH. Dr. Brunson noted that, prior to the surgery, Toy had cardiomyopathy, an illness of the heart, and a number of other "significant" illnesses. He first testified that the dosage of propofol given to Toy was acceptable, particularly pointing out that propofol is a short-acting drug. With regard to the lack of pulse oxygen reading, Dr. Brunson opined that

> if anything, it keeps the blood from flowing up here or if you get cold or vasoconstricted or if you have peripheral vascular disease it's hard for the blood to get out there in the first place, and so you'll lose the reading on the pulse oximeter. The other thing that would cause that from happening is because this was a shared arm, the surgeon was operating on one arm, and so they had to put the blood pressure cuff on the same arm as the pulse oximeter.

So every time the blood pressure cuff goes up it takes the pressure and squeeze the arm and stop the blood flow, and so you're gonna have intermittent times when the pulse oximeter is not going to pick up whenever the cuff is going up.

Dr. Brunson consequently testified that simply because the pulse oximeter does not get a reading does not mean that the patient has no oxygenation in his blood. He also opined that it was more important for Simcox to turn his attention to Toy due to his condition, rather than to record blood pressure readings. Dr. Brunson noted the presence of end-tidal carbon dioxide measurements. He defined it as

[e]nd-tidal $CO_2$ is we breathe in oxygen and we blow out carbon dioxide, and so we actually look at the end-tidal $CO_2$ as one of the more important monitors. Because we can get you saturated but we've got to get the oxygenated blood around to the important organ systems in the body, and the way we know that is if you then return $CO_2$ back and you breathe it out, we know that the entire cycle is working then.

He testified that the recorded $CO_2$ levels in the OR record indicate that Toy's "complete respiratory cycle was present" also noting that "[y]ou cannot have expired $CO_2$ if you're not circulating."

¶16. Dr. Brunson testified that if Toy was pulseless with no blood pressure "for 10 or 15 minutes, it's physiologically unsustainable for life." He further testified that the resuscitative efforts used were appropriate. He noted that the record indicated neurological activity in Toy after the surgery, which is important because "[i]f you get an anoxic brain injury from lack of oxygen, it's usually a global hypoxic event for the whole brain, and you will generally not see neurological activity following that." He opined that perhaps the incident in the ICU in which Toy's tube was extubated caused the brain injury. He concluded that no anoxic brain injury occurred in the OR.

10

¶17. The trial court entered judgment in favor of GLH. In its Findings of Fact and Conclusions of Law (FOFCOL), it found Toy "was having a gaseous exchange required to circulate oxygen through the bodily system." It specifically noted that the end-tidal carbon dioxide monitor recorded a positive reading during the surgery. It also specifically noted that "[t]he Court found Dr. Dipaolo to be a credible witness whose testimony was given in a calm professional, matter-of-fact, manner. The Court accepts Dr. Dipaolo's testimony as truthful." It concluded that Toy was revived within less than one minute after his cardiac arrest and that "[a]t no time from the point prior to the procedure, when Mr. Toy was placed on supplemental oxygen, through the time of his arrest was Mr. Toy ever deprived of oxygen." The trial court further found that "[n]o evidence was presented in regard to the care and treatment rendered to Mr. Toy after 3:00 p.m. on September 17, 2008." The trial court applied its findings to the elements of negligence in a medical malpractice lawsuit. While the court found that a duty did exist, it found that Toy's cardiac arrest occurred in the absence of any negligence. It found that Toy was not overmedicated and that the drugs given him were administered within the standard of care. It further found that Prayer failed to establish that Weathers or Simcox breached the standard of care or that any such breach proximately caused Toy's injury or death. Indeed, it found that "Mr. Weathers and Mr. Simcox met or exceeded the applicable standard of care in their care and treatment of Jones Toy at all times and in all respects. The Court further finds that nothing Mr. Weathers or Mr. Simcox did or failed to do proximately caused or contributed to any injury to Mr. Toy or Mr. Toy's death."

¶18. Prayer appeals to this Court. The sole issue she raises on appeal is that the trial

11

court's FOFCOL is not supported by substantial, credible, and reasonable evidence.

## ANALYSIS

¶19.    In a medical malpractice case, this Court reviews the trial court's findings for manifest or clear error. *Univ. Med. Ctr. v. Martin*, 994 So. 2d 740, 746 (Miss. 2008). The trial court's "findings must be supported by substantial, credible, and reasonable evidence." *Id.* Its findings are accorded deferential treatment, such that "[f]indings of fact by a trial judge after a bench trial are subject only to a limited scope of review if the trial judge applied the appropriate legal standard." *Id.* If the record contains substantial supporting evidence, "this Court will not reverse a trial court's findings, even if this Court disagrees with those findings." *Id.* at 747. In determining whether the trial court's findings are supported by substantial, credible, and reasonable evidence, this Court "must examine the entire record and must accept[] that evidence which supports or reasonably tends to support the findings of fact made below, together with all reasonable inferences which may be drawn therefrom and which favor the lower court's findings of fact." *Id.* (internal quotations omitted). Moreover, conflicting testimony is to be resolved by the trier of fact, the judge in a bench trial. *Id.* at 746. The trial judge in a bench trial must also determine questions of weight and credibility of testimony, including that of experts. *Id.* at 747.

¶20.    Prayer argues that the trial court's finding that Toy did not suffer a brain injury while in the surgical suite is not supported by credible evidence. She further argues that the credible evidence shows that Toy did suffer a brain injury during surgery. She also claims that the court should not rely on testimony from Simcox, as his testimony was inconsistent,

12

controverted, and self-serving.

¶21. It is certainly true that the record contains credible evidence tending to show that Toy suffered a brain injury during surgery. The OR record contains no blood pressure or pulse oxygen readings for nearly fifteen minutes, the ICU records contain multiple notations that indicate that Toy was unresponsive after surgery and never regained any ability to respond, the ICU records indicate that doctors suspected brain injury, one doctor's note contains a written suspicion that brain injury occurred during surgery, and Prayer's experts opined that Toy was overdosed and that Simcox failed to timely and appropriately respond when Toy crashed, and thus deprived him of oxygen for ten to fifteen minutes.

¶22. Conversely, the record also contains credible evidence tending to show that Toy did not suffer a brain injury during surgery, that he did not suffer any lack of oxygen during surgery, and that no standards of care were breached. Simcox testified that Toy was breathing until the cardiac arrest event at the end of the surgery. Dr. DiPaolo testified that Toy's fistula pumping blood was noticeable to her and that she did not notice it stop pumping blood until the end of the surgery, at which point resuscitative efforts began immediately. She also testified that she was able to obtain bleeding in the finger toward the end of the surgery, which would not have occurred had Toy stopped circulating oxygen. The OR record contains carbon dioxide exhalation measurements for the entire surgery, which Dr. Brunson opined would not have occurred had Toy ceased circulating oxygen. Dr. Brunson testified as to his opinion that Toy was not overmedicated and that he did not suffer a brain injury in the OR, noting that had Toy been without oxygen for ten or fifteen minutes, resuscitation

13

would have been impossible. The medical record indicated that some neurological signs were present after surgery, and Dr. Brunson testified that these neurological signs would be unlikely to be present had Toy suffered a hypoxic event in the OR. Dr. Brunson opined that the extubation event on September 21, 2008, in the ICU was more likely to have caused Toy's brain injury.

¶23. This is a case in which, as many do, the record contains conflicting credible evidence, with evidence supporting each party's theories. In this case, the trial court was tasked with determining the weight and credibility of the evidence and resolving the conflicting evidence. The trial court specifically found Dr. DiPaolo to be very credible, and her testimony lent credence to GLH's theory that the brain injury did not occur during surgery. It ultimately resolved the conflicting evidence in favor of GLH. In reviewing the entire record, this Court "must accept[] that evidence which supports or reasonably tends to support the findings of fact made below, together with all reasonable inferences which may be drawn therefrom and which favor the lower court's findings of fact." *Martin*, 994 So. 2d at 747 (internal quotations omitted). In accepting all the evidence which reasonably tends to support the trial court's findings of facts, as well as the reasonable inferences which may be drawn therefrom, it is clear that the trial court did not manifestly err in this case. While enough evidence exists in the record such that reasonable minds may disagree, substantial, credible, and reasonable evidence exists to support the trial court's findings in favor of GLH.

## CONCLUSION

¶24. Conflicting credible evidence exists in the record supporting both sides of the

14

argument as to whether Toy suffered a brain injury in the OR. The trial court resolved the conflicting evidence in favor of GLH. Because substantial, credible, and reasonable evidence exists to support the trial court's judgment, the trial court did not commit manifest error by entering judgment in favor of GLH, and this Court therefore affirms the judgment of the Leflore County Circuit Court.

¶25. **AFFIRMED**

**WALLER, C.J., DICKINSON AND RANDOLPH, P.JJ., LAMAR, KITCHENS, PIERCE, COLEMAN AND MAXWELL, JJ., CONCUR.**