# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-CA-01014-COA

RETHA SIMMONS, AS ADMINISTRATRIX OF
THE ESTATE OF MELVIN R. SIMMONS AND
ON BEHALF OF ALL WRONGFUL DEATH
BENEFICIARIES OF MELVIN R. SIMMONS,
AND INDIVIDUALLY

APPELLANT

v.

JACKSON COUNTY, MISSISSIPPI AND JOE
O'NEAL, IN HIS OFFICIAL CAPACITY AS
JACKSON COUNTY ROAD MANAGER

APPELLEES

DATE OF JUDGMENT:           10/23/2019
TRIAL JUDGE:                HON. DALE HARKEY
COURT FROM WHICH APPEALED:  JACKSON COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:     L. CLARK HICKS JR.
ATTORNEYS FOR APPELLEES:    DANIEL JUDSON GRIFFITH
                            JAMES H. COLMER JR.
NATURE OF THE CASE:         CIVIL - WRONGFUL DEATH
DISPOSITION:                AFFIRMED - 05/03/2022
MOTION FOR REHEARING FILED: 05/13/2022 - DENIED; AFFIRMED -
                            11/22/2022

EN BANC.

SMITH, J., FOR THE COURT:

### MODIFIED OPINION ON MOTION FOR REHEARING

¶1.     The motion for rehearing is denied. The previous opinion of this Court is withdrawn,

and this opinion is substituted in its place.

¶2.     On the evening of February 6, 2016, Melvin Simmons was driving home on Old River

Road in Jackson County, Mississippi, when his vehicle left the road and struck a culvert. The

collision ejected Simmons from his vehicle, and he died as a result of his injuries. As the

administratrix of her late husband's estate, Retha Simmons, both individually and on behalf of Simmons's wrongful-death beneficiaries, filed a lawsuit under the Mississippi Tort Claims Act (MTCA) against Jackson County and Joe O'Neal in his official capacity as the Jackson County Road Manager (collectively, the County). Retha's lawsuit also raised claims against Mallette Brothers Construction Company Inc. (Mallette), the company hired to repave the road just prior to Simmons's death. Simmons's accident occurred after Mallette had finished repaving the road but before shoulder work had begun. Retha alleged in part that the County's and Mallette's (collectively, the Defendants) negligent maintenance of Old River Road during this time period had contributed to Simmons's death.

¶3. The Jackson County Circuit Court held a joint bench and jury trial on the claims raised in Retha's complaint (wrongful death, negligence, and joint-venture liability). The jury determined the claims asserted against Mallette, and the circuit court adjudicated all the claims involving the County. At the conclusion of Retha's case-in-chief, the circuit court found Retha had presented insufficient evidence to establish a joint venture between the County and Mallette, and the court therefore involuntarily dismissed the claim regarding joint-venture liability. Following the conclusion of the Defendants' case-in-chief, the circuit court "found that the conditions of Old River Road, including the low shoulders and steep edge drop-offs" that resulted from the road work, were open and obvious to a motorist exercising due care. The court further determined that the road conditions were especially "known and appreciated" by Simmons, who had lived on the road for over forty-five years

2

and had frequently driven along the road. Based on its findings, the circuit court concluded that the County bore no liability for the failure-to-warn claim asserted under Mississippi Code Annotated section 11-46-9(1)(v) (Rev. 2019). The circuit court did not, however, issue any further bench rulings.

¶4. Following deliberations, the jury returned a verdict in Mallette's favor and found that Mallette bore no liability for Simmons's accident. On October 17, 2019, the circuit court entered its findings of fact and conclusions of law as to the remaining liability claim against the County. The circuit court ultimately concluded that while the County had created a dangerous road condition, Simmons's own negligence while driving along Old River Road was the sole proximate cause of his accident. As a result, the circuit court held that the County bore no liability for Simmons's death.

¶5. On appeal, Retha does not contest the jury's verdict in favor of Mallette. Instead, she only challenges the circuit court's ruling that the County bore no liability for Simmons's death. Retha argues that the circuit court manifestly erred by failing to apportion a percentage of the fault for Simmons's accident to the County. Upon review, we find that substantial evidence supports the circuit court's findings. We therefore affirm the circuit court's judgment.

**FACTS**

¶6. The County owns and maintains Old River Road. Pursuant to its contract with the County, Mallette performed an asphalt overlay on an approximately six-mile section of Old

3

River Road in January 2016. Prior to the project, the County notified residents of the upcoming road work through newspaper, radio, and television advertisements. Signs were also placed at either end of the work zone to notify motorists of the upcoming project. While performing the road work, Mallette placed its own safety signs throughout the work zone, and flagmen directed traffic.

¶7. For over two weeks after Mallette completed the asphalt overlay, Old River Road had a shoulder drop-off of at least twelve inches. The evidence reflected that the newly laid asphalt needed time to completely cool before heavy machinery could traverse the roadway and perform the shoulder work. During that time, the road had no center-line or edge-line striping to delineate its travel lanes and edges. After completing the repaving, Mallette had removed all its own safety signs. The County, however, had placed "Shoulder Work Ahead" signs at either end of the project to notify motorists that shoulder work would begin on the road in February 2016.

¶8. At trial, Retha testified that she and Simmons had lived on Old River Road for over forty-five years and were aware of the road work. Retha stated that everyone, including she and Simmons, knew the section of road under repair had no line striping. Retha and other witnesses described Old River Road as very dark at night and stated that the road lacked any streetlights or other artificial lights to illuminate it. Although Retha tried to avoid driving through the road work, especially at night, she stated that Simmons did not share her concerns and would drive through the area regularly on his way to and from his hunting

4

camp.

¶9.     Around 6:30 p.m. on February 6, 2016, Simmons was driving home along Old River Road after leaving his hunting camp.  On his way home, Simmons and a pickup truck, which was driving in the opposite direction and hauling a bass boat behind it, passed each other.  The truck's driver, Adam White, stated that he and Simmons each moved toward their respective edge of the road as they passed one another.  The posted speed limit on Old River Road was 40 miles per hour.  Although White did not know Simmons's exact speed, he estimated that Simmons was driving around 50 or 55 miles per hour as they passed each other.  White stated that the road work on Old River Road had forced him to reduce his speed to about 35 miles per hour.  Although he had his truck's headlights on dim, White testified that he could see the roadway and its edges.  In contrast with his own reduced speed, White testified that Simmons appeared to be driving "fast" given the road conditions and did not appear to slow down as the two vehicles approached each other.  White stated that something "wasn't right" about Simmons's vehicle, and as White watched in his rearview mirror, he saw Simmons's vehicle leave the road and flip through the air.  White turned his truck around and returned to help Simmons, but Simmons had been ejected from his vehicle and died from his injuries.

¶10.    On January 10, 2017, Retha filed a wrongful-death suit against the County.  She subsequently filed an amended complaint on December 4, 2017, that named Mallette as an additional defendant in the lawsuit.  The County and Mallette filed their respective answers

and affirmative defenses to the amended complaint. Following a joint bench and jury trial, the circuit court concluded that "the conditions of Old River Road, including the low shoulders and steep edge drop-offs, were, as to Mr. Simmons, open, obvious, known and appreciated" and "that the open and obvious nature of the road's condition precluded a claim against the County for failure to warn . . . ." The circuit court therefore dismissed the failure-to-warn claim against the County, and the jury returned a verdict finding Mallette bore no liability for Simmons's accident.

¶11. The circuit court subsequently entered its findings of fact and conclusions of law as to the remaining issue against the County. The circuit court held that the County breached a ministerial duty imposed by statute when it failed to mark Old River Road with temporary center lines and created a dangerous condition—the steep shoulder drop-off—while the asphalt cooled before it rebuilt the roadway's shoulder. The circuit court concluded, however, that neither the County's breach of its ministerial duty nor the dangerous road condition proximately caused Simmons's accident. As previously discussed, the circuit court determined that the condition of Old River Road was "open and obvious to a motorist exercising due care" and was specifically known and appreciated by Simmons. In assessing the parties' comparative negligence, the circuit court found that Simmons's own negligence in failing to comply with the duties imposed on him as a motorist exercising due care within a construction zone constituted the sole proximate cause of his accident. The circuit court therefore ruled in favor of the County. Aggrieved, Retha appeals.

6

**DISCUSSION**

¶12.    "[W]e apply the substantial-evidence standard of review" to "the factual findings of [a] circuit court sitting as the sole trier of fact in a bench trial . . . ." *City of Jackson v. Hilton*, 324 So. 3d 1164, 1170 (¶18) (Miss. Ct. App. 2021) (quoting *Delta Reg'l Med. Ctr. v. Taylor*, 112 So. 3d 11, 23 (¶35) (Miss. Ct. App. 2012)).  In so doing, "we must accept that evidence which supports or reasonably tends to support the findings of fact made below, together with all reasonable inferences which may be drawn therefrom and which favor the circuit court's findings of fact." *Id.* (internal quotation marks omitted) (quoting *Univ. Med. Ctr. v. Martin*, 994 So. 2d 740, 747 (¶26) (Miss. 2008)).

¶13.    Relevant to this appeal, section 11-46-9(1)(v) provides that a governmental entity cannot be held liable for claims

> [a]rising out of an injury caused by a dangerous condition on property of the governmental entity that was not caused by the negligent or other wrongful conduct of an employee of the governmental entity or of which the governmental entity did not have notice, either actual or constructive, and adequate opportunity to protect or warn against; *provided*, however, that a governmental entity shall not be liable for the failure to warn of a dangerous condition which is obvious to one exercising due care . . . .

(Emphasis added).

¶14.    As this Court has previously explained, "the italicized 'provided' clause 'is a complete bar in a Tort Claims Act case for the failure to warn of a dangerous condition.'" *Campbell v. Harrison Cnty. Bd. of Supervisors*, 269 So. 3d 1269, 1273 (¶15) (Miss. Ct. App. 2018) (quoting *City of Natchez v. Jackson*, 941 So. 2d 865, 876 (¶33) (Miss. Ct. App. 2006)).

7

Governmental entities therefore bear no liability where they fail to warn of open and obvious conditions. *Id.* As our caselaw further recognizes, however, "the open-and-obvious defense is not a complete bar to recovery for every premises liability claim against a governmental entity." *Id.* at 1274 (¶15). Instead,

> as the statute clearly states, the fact that a dangerous condition is obvious only exempts the governmental entity from liability for the failure to warn of the condition. It is not a bar to recovery when the issue is the government's negligent maintenance or repair which led to the dangerous condition.

*Id.* (citation and internal quotation marks omitted). In cases such as the one presently before us where "the plaintiff alleges that the defendant negligently created . . . a dangerous condition, 'the "open and obvious" standard is simply a comparative negligence defense used to compare the negligence of the plaintiff to the negligence of the defendant.'" *Id.* at 1274-75 (¶18) (quoting *Mayfield v. The Hairbender*, 903 So. 2d 733, 737 (¶18) (Miss. 2005)). "[T]he [Mississippi] Supreme Court has also held[, however,] that 'the open and obvious defense remains a complete bar to a negligence claim' if 'the plaintiff is one hundred percent (100%) negligent himself.'" *Id.* at 1275 (¶19) (quoting *Fulton v. Robinson Indus. Inc.*, 664 So. 2d 170, 176 (Miss. 1995)).

¶15. Here, the parties do not challenge the circuit court's findings that (1) the condition of Old River Road was open and obvious, (2) the County created the dangerous condition of low shoulders and steep edge drop-offs without temporary line striping, and (3) Simmons bore partial responsibility for his accident. Instead, the only disputed issue on appeal is whether the circuit court correctly concluded that Simmons's accident resulted solely due to

8

his own negligence. In her appellate brief, Retha acknowledges that the record supports apportioning a percentage of the fault for the accident to Simmons. She maintains, however, that the circuit court manifestly erred by finding the County's actions failed to also contribute to Simmons's death.

¶16. In considering liability for Simmons's accident, the circuit court noted that motorists bear certain responsibilities when operating a vehicle. Especially relevant to the present appeal, our caselaw holds that "enhanced care" is "required of motorists who encounter highway construction . . . ." *Miss. Dep't of Transp. v. Trosclair*, 851 So. 2d 408, 417-18 (¶32) (Miss. Ct. App. 2003). As we explained in *Trosclair*, this enhanced-care standard requires "that when one is sufficiently warned that a public thoroughfare is under construction or undergoing repairs, he should exercise a vigilant caution and keep a constant lookout for dangers incident to the progress of the work." *Id.* at 418 (¶32) (quoting *Bush Const. Co. v. Blakeney*, 350 So. 2d 1370, 1373 (Miss. 1977)).

¶17. Like Simmons, the motorist in *Trosclair* suffered injuries when her vehicle left a newly repaved road that had a three-to-six-inch shoulder drop-off and lacked any temporary center-line or edge striping. *Id.* at 412 (¶¶4-7). The motorist asserted that her accident would not have occurred if the road had been marked with center-line and edge stripes. *Id.* at 418 (¶34). This Court found, however, that the undisputed evidence showed (1) the motorist knew she had entered a portion of road undergoing repaving, (2) the shoulder drop-off was obvious even though the exact elevation change was not known, and (3) the edge of the road

9

was clearly visible. *Id.* at 417 (¶28). Because the edge of the road was clearly visible in *Trosclair*, we held "it does not matter that a painted line might have more colorfully noted that edge." *Id.* at 418 (¶34).

¶18.    Although undisputed testimony reflected that the injured motorist in *Trosclair* had been driving the posted speed limit, we recognized that "[t]he operator of a motor vehicle has a duty to keep the vehicle under proper control and to drive at a speed which is reasonable *under the conditions that she faces*." *Id.* at (¶35) (emphasis added). Thus, if the lack of temporary road striping "was such as to cause [the motorist] doubts about maintaining her position on the roadway, then the obligation of care was to slow down." *Id.* at (¶34). We therefore held in *Trosclair* that the motorist "did not meet the 'vigilant caution' standard for drivers on roads under construction" and that her own negligence partially contributed to her accident. *Id.* at 418-19 (¶¶35-36).

¶19.    Here, the only eyewitness testimony about Simmons's accident came from White, who passed Simmons immediately before the accident and then watched in his rearview mirror as Simmons's vehicle left the road. Although the posted speed limit on Old River Road was 40 miles per hour, White testified that at the time of the accident, he had reduced his speed to about 35 miles per hour due to the ongoing road work. Even with his headlights on dim, White stated that he had no problem seeing the road and its edges as he drove that evening.

¶20.    Given the road conditions, White testified that Simmons seemed to be driving "fast" as he approached. White estimated that Simmons was driving around 50 or 55 miles per hour

10

on the road and did not appear to reduce his speed as he approached White's truck. According to White, something "wasn't right" about Simmons's vehicle as it approached and then passed him. As a result, White continued to watch the other vehicle in his rearview mirror even after it passed him.

¶21. The record clearly establishes that Old River Road lacked any temporary line striping to mark the roadway's lanes or edges. Even without the line striping, however, the circuit court concluded the witness testimony "demonstrated that the edges of the pavement were visible with their [vehicles'] head lamps." As the circuit court noted, "[e]very witness with personal knowledge of the road conditions existing at the time of the accident attested to the need for vigilant caution." Similarly to White, Joey Rocco, who was Simmons's friend and arrived on the scene shortly after the accident occurred, testified that he did not have trouble remaining on Old River Road that evening or finding the edges of the road. Rocco stated that he did not need warning signs to tell him what he already knew about the road conditions; rather, he simply made sure to drive slowly through the area.

¶22. Retha's accident reconstructionist, Ben Smith, opined that it was impossible from the evidence to reliably calculate the speed of Simmons's vehicle at the time of the accident. According to Smith, there was not sufficient evidence to show whether Simmons was driving more or less than 40 miles per hour. Thus, rather than focusing on Simmons's speed as a cause of the accident, Smith testified that he focused on the road conditions and typical patterns of human behavior in determining a cause for Simmons's accident.

¶23.    As a result of the ongoing work on Old River Road at the time in question, the circuit court held that Simmons "was required to operate his vehicle at a reasonable speed for the conditions then and there existing" and "was required to exercise an enhanced level of care . . . ." The undisputed evidence supports the circuit court's finding that "Simmons was not an unsuspecting motorist suddenly encountering the conditions as they existed on the night of this accident" but was well aware, prior to his accident, of the conditions Old River Road posed. The evidence reflected that Simmons had driven regularly on Old River Road at various times of the day and had discussed the conditions of the road with Retha.

¶24.    Based on the trial testimony and evidence, the circuit court found that additional warnings and temporary lane markings "would not have alerted Mr. Simmons to any dangers of which he was not already aware, nor, in the estimation of [Retha's] accident reconstruction expert, would such signs have prevented Mr. Simmons from leaving the roadway." Similar to this Court's holding in *Trosclair*, the circuit court found that if Simmons experienced any uncertainty regarding his lane of traffic while traversing Old River Road, his obligation as a motorist exercising due care for his own safety was to reduce his speed like White testified he did.

¶25.    Retha repeatedly contends the circuit court determined that "Jackson County committed multiple negligent acts and omissions during the road maintenance." Although the circuit court determined the County had "created a dangerous condition—the steep shoulder drop-off," the court made no findings that the condition at issue resulted from any

"negligent or other wrongful conduct" by the County or its employees. As discussed, section 11-46-9(1)(v) of the MTCA shields a governmental entity from liability for claims based on a dangerous condition when the condition was "not caused by the negligent or other wrongful conduct of an employee of the governmental entity." The testimony presented at trial reflected it was necessary for the County to wait several days after repaving Old River Road before bringing in the heavy equipment needed to complete the shoulder work. The testimony also reflected that any delay in commencing the shoulder work was due to equipment maintenance and not the fault of the County. We therefore find no support in the record for Retha's allegations that negligence by the County contributed to Simmons's injuries. Regardless, this was a fact-finding made by the circuit court that does not rise to the level of manifest error.

¶26. On appeal, we must adhere to the well-established standard of review of "'[a]ccepting all the evidence which reasonably tends to support the circuit court's findings of facts, as well as the reasonable inferences which may be drawn therefrom . . . .'" *Hilton*, 324 So. 3d at 1173 (¶29) (quoting *Prayer v. Greenwood Leflore Hosp.*, 183 So. 3d 877, 884 (¶23) (Miss. 2016)). In so doing, we find sufficient evidentiary support for the circuit court's determination that Simmons's own negligence in failing to exercise vigilant caution and reduce his speed as he drove through the work on Old River Road constituted the sole proximate cause of his accident. We therefore find no manifest error in the circuit court's judgment.

13

## CONCLUSION

¶27. Because substantial credible evidence supports the circuit court's findings, we find no manifest error. Accordingly, we affirm the circuit court's judgment.

¶28. **AFFIRMED.**

**BARNES, C.J., WILSON, P.J., GREENLEE, LAWRENCE, McCARTY AND EMFINGER, JJ., CONCUR. WESTBROOKS, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY CARLTON, P.J., AND McDONALD, J.**

**WESTBROOKS, J., DISSENTING:**

¶29. Because I believe the circuit court committed manifest error both when it failed to allocate a portion of the fault for Simmons' accident to Jackson County and when it erroneously applied an open-and-obvious standard to Simmons' claim, I respectfully dissent.

### I. Failure to Allocate Fault to Jackson County

#### A. Proximate Cause

¶30. "Those who are negligent and proximately contribute to an injury should be allocated a percentage of fault." *Miss. Dep't of Transp. v. Trosclair*, 851 So. 2d 408, 417 (¶27) (Miss. Ct. App. 2003) (citing Miss. Code Ann. § 85-5-7 (Rev. 1999)). Mississippi Code Annotated section 85-5-7(1) defines fault as "an act or omission of a person which is a proximate cause of injury . . . ." Miss. Code Ann. § 85-5-7(1) (Rev. 2011). The circuit court, in its facts and findings, acknowledged this statutory requirement prior to holding that Simmons "was the sole proximate cause" of the accident. This holding ignores our Court's definition of proximate cause, giving rise to the manifest error in this case. Based on the evidence in the

14

record, I believe that it has been overwhelmingly established that Jackson County's negligence was a proximate cause of Simmons' injury.

¶31.    "In order for an act of negligence to proximately cause the damage, the fact finder must find that the negligence was both the cause in fact and legal cause of the damage." *Glover ex rel. Glover v. Jackson State Univ.*, 968 So. 2d 1267, 1277 (¶31) (Miss. 2007) (citing Dobbs, The Law of Torts, § 180, at 443 (2000)).  "Cause in fact" means that, but for the defendant's negligence, the injury would not have occurred.  *City of Jackson v. Spann*, 4 So. 3d 1029, 1033 (¶11) (Miss. 2009) (citing *Glover*, 968 So. 2d at 1277 (¶32)).  A cause-in-fact can be described as "that cause which, in natural and continuous sequence unbroken by any efficient intervening cause, produces the injury and without which the injury would not have occurred."  *Glover*, 968 So. 2d at 1277 (¶32) (quoting *Gulledge v. Shaw*, 880 So. 2d 288, 293 (¶11) (Miss. 2004)).  An action is the "legal cause" of the injury when "the damage is the type, or within the classification, of damage the negligent actor should reasonably expect (or foresee) to result from the negligent act."  *Id.* at (¶33) (citing Dobbs, The Law of Torts, § 180 at 443).  Caselaw further shows that "there may be more than one proximate cause of an injury"  *Mathews v. Thompson*, 231 Miss. 258, 95 So. 2d 438, 448 (1957) (citing 38 Am. Jur. *Negligence* § 63).

¶32.    Notably, the circuit court did not find that Simmons' driving was a superseding cause; instead, the court found that Simmons was the sole proximate cause of the accident.  I respectfully disagree that such finding is not manifestly wrong, as the evidence drastically

departs from the circuit court's findings. "An intervening cause is one which comes into active operation in producing the [injury] *after* the negligence of the defendant." William Prosser & W. Page Keeton, Law of Torts, § 44, at 301-03 (5th ed. 1984). An intervening cause may be considered a "superseding cause" and thus shield a defendant from liability. *Southland Mgmt. Co. v. Brown ex rel. Brown*, 730 So. 2d 43, 46 (Miss. 1998). But the Supreme Court has also affirmed that "if the occurrence of the intervening cause might reasonably have been anticipated, such intervening cause will not interrupt the connection between the original cause and the injury." *Mathews*, 95 So. 2d at 449-50. "Thus, under principles of 'foreseeability,' a defendant may be held liable for his failure to anticipate an easily-predicted intervening cause and to properly guard against it." *Southland Mgmt. Co.*, 730 So. 2d at 46.

¶33. The circuit court correctly noted in its facts and findings that "negligence in the abstract does not impose liability." It further explained that a defendant's negligence as a proximate cause must be present. But the circuit court proclaimed that Simmons was the sole proximate cause of his accident. This conclusion ignored the undisputed evidence in the record that Jackson County created a dangerous condition: a steep shoulder drop-off, which the circuit court believed "was in excess of anything that could be considered reasonable," and that Jackson County breached its statutory duty to mark temporary center lines on the

16

road which was undergoing reconstruction or maintenance, opening the road to the public.[1]

¶34.    Retha's expert engineer, David Gardner, testified that a "drop-off" is "when [the drop] is in excess of three inches." He explained that drop-offs were a hazard to motorists. The drop-off on Old River Road was photographed as having a height of approximately sixteen inches in one area. Photos of the accident scene, taken by the sheriff's office the morning after the accident, show the intersection of Old River Road and Blackfoot Road where the accident occurred. Deep drop-offs were also documented in these photos. Local residents testified that the drop-off was eighteen inches or more. There were no statutorily required temporary center stripes in the photos. The circuit court even acknowledged that the record shows Jackson County breached this statutory duty to mark temporary center stripes.

¶35.    Accident reconstructionist Ben Smith noted that Simmons was scraping his Jeep along the edge of the drop-off, oscillating, actively trying to get back on the road. Expert city engineer David Gardner testified that without a center line on a dark county road it is difficult to navigate back on the road because "it's hard for you to have a reference" in a "dark rural setting." He also noted that any drop-off over two inches is considered severe. Gardner also specifically opined Simmons was unable to recover control of the vehicle due to the dark

---

[1] Mississippi Code Annotated section 65-7-123 (Rev. 2012) reads: "Any segment of a county-maintained, hard-surfaced highway normally marked by center line safety stripes which is overlayed with hot mix asphalt while undergoing reconstruction or maintenance *shall* be marked with temporary center line safety stripes if permanent center line safety stripes will not be installed before such segment is opened for public use." (Emphasis added).

weather conditions and the lack of any center-line stripe, stating "obviously you can't recover back when you are traveling over an edge like that." The defense expert did not refute these assertions, admitting to the creation of a hazardous condition, although explaining that it was unavoidable in the course of paving a road. In reality, no expert is required to tell us what common sense dictates: but for the steep drop-off, Simmons would have been able to return his vehicle onto Old River Road, and the accident would never have occurred in the way it did.

¶36.   Furthermore, this accident was entirely foreseeable from Jackson County's vantage point. The accident was of the "type, or within the classification, of damage the negligent actor should reasonably expect (or foresee) to result from the negligent act." *Glover*, 968 So. 2d at 1277 (¶33) (citing Dobbs, The Law of Torts, § 180, at 443). When a roadway shoulder consists of a large drop-off from which a vehicle cannot recover its position on the road, it is entirely foreseeable that an automobile crash will occur. Additionally, when people fail to put statutorily required temporary striping on the roads, it is foreseeable that other people will not be able to properly maintain their lane and, again, that an automobile crash will occur. These scenarios are "the type, or within the classification, of damage the negligent actor should reasonably expect (or foresee) to result from the negligent act." *Id*. Moreover, as the circuit court stated, the "clear intent [of the statute] is for public safety." This rationale underscores the foreseeability of the results of failure to comply with the statute. Because the accident was both a but-for cause and a legal cause of Simmons' accident, proximate

18

cause has been established.

### B. Simmons' Duties

¶37. It is true, as the majority states, that Simmons also had duties that he breached. However, Simmons' breach of duty does not necessarily absolve others from liability due to negligence. Simmons had the duty to be vigilant pursuant to the *Trosclair* holding "that a driver upon entering a road she knows is undergoing repair to exercise vigilant caution." *Trosclair*, 851 So. 2d at 417 (¶31). *Trosclair* also notes that if a party has "doubts about maintaining her position on the roadway, then the obligation of care was to slow down." *Id.* at 418 (¶34). Testimony showed that Simmons did not slow down below the speed limit of 40 miles per hour. However, "[t]he correlative duties of the contractor of a road under construction and a traveler on the road *are determined by all the circumstances*." *See Webb v. Brock*, 232 Miss. 154, 98 So. 2d 139, 142 (1957) (emphasis added). This premise is illustrated in *Trosclair*, when both the County and the driver were found to be negligent in their duties, and this Court determined that fault should be allocated to both parties. *Trosclair*, 851 So. 2d at 419 (¶37).

¶38. Jackson County admitted that it had a duty to make sure its roads were reasonably safe during repaving. The experts testified that a drop-off of a mere two inches is considered severe. The circuit court itself found that a shoulder drop-off of this magnitude "was in excess of anything that could be considered reasonable" and that a dangerous condition arose from the drop-off coupled with the lack of statutorily required center striping that would

19

permit drivers to gauge the lane. A clear breach of duty occurred on the part of Jackson County too. And moreover, as the majority reminds us, "[open and obvious conditions are] not a bar to recovery when the issue is the government's negligent maintenance or repair which led to the dangerous condition." *City of Natchez v. Jackson*, 941 So. 2d 865, 876 (¶33) (Miss. Ct. App. 2006).

¶39. Finally, *Trosclair*'s proclamation that "since the edge of the roadway was clearly visible, it does not matter that a painted line might have more colorfully noted that edge" does not apply in the present case. *Trosclair*, 851 So. 2d at 418 (¶34). Trosclair was driving during daylight hours on Highway 49, a time when the road would have been more visible. *Id.* at 417 (¶28). More importantly, *Trosclair* noted that "intermittent splotches of white" had properly been applied as temporary center-line markings during the repaving process. *Id.* at 418 (¶34). In the present case, testimony from local residents established that the unlined road was dark and hard to see at night. This set of facts clearly differs from Highway 49, where Trosclair had her accident in the daylight.

¶40. Because of the foregoing, I believe that it is undisputed that Jackson County was a proximate cause of the accident, and the circuit court's failure to allocate at least partial fault to Jackson County rises to the level of manifest error.

## II. Open and Obvious Condition and Obviating Negligence Claims Under Premises Immunity

¶41. In its facts and findings, the circuit court correctly acknowledged *Calonkey v. Amory School District*, 163 So. 3d 940 (Miss. Ct. App. 2014), which holds that the premises

immunity of the MTCA "clearly states [that] the fact that a dangerous condition is obvious only exempts the [defendant] from liability *for the failure to warn of the condition.*" *Id.* at 943 (¶14) (emphasis added) (citing Miss. Code Ann. § 11-46-9(1)(v) (Rev. 2002)).  Again, "[an open and obvious condition] is not a bar to recovery when the issue is the government's negligent maintenance or repair which led to the dangerous condition." *City of Natchez*, 941 So. 2d at 876 (¶33).  And yet the circuit court addressed the negligence portion of the claim with frequent mentioning of the open-and-obvious standard, used by the majority and the circuit court alike.  The circuit court specifically noted that "while it was the County's duty not to create dangerous conditions and to mark this roadway with temporary center line stripes, the Court cannot ascribe fault for this failure when these conditions were *known and appreciated* by Mr. Simmons."

¶42.    *Campbell v. Harrison County Board of Supervisors*, 269 So. 3d 1269 (Miss. Ct. App. 2018), notes:

> [T]he obviousness of a dangerous condition does not exempt the governmental entity from liability if the plaintiff can show that the condition existed or was not corrected because the governmental entity negligently failed to maintain the premises in a reasonably safe condition. Thus, in most cases like this one, in which the plaintiff alleges that the defendant negligently created or failed to protect invitees from a dangerous condition, "[t]he 'open and obvious' standard is simply a comparative negligence defense used to compare the negligence of the plaintiff to the negligence of the defendant.

*Id.* at 1274-75 (¶18).  Nevertheless, this same court noted that the open-and-obvious standard *may* be a complete bar to a negligence claim if "the plaintiff is one hundred percent (100%) negligent himself."  *Id.* at 1275 (¶19) (quoting *Fulton v. Robinson Indus. Inc.*, 664 So. 2d

21

170, 176 (Miss. 1995)). The *Campbell* court explained that an invitee must use the standard of care that a "person of ordinary intelligence would exercise under the same or similar circumstance," but the Court also held that "the property owner [still] 'owes a duty to an invitee to exercise reasonable or ordinary care to keep the premises in a reasonably safe condition.'" *Id*. (quoting *Fulton*, 664 So. 2d at 175). I believe this duty to keep the premises in a reasonably safe condition was breached by Jackson County, which was a proximate cause of the accident as discussed above. Given this conclusion, it does not follow that Simmons could possibly be "one hundred percent negligent." *Id*.

¶43.    The majority cites *Campbell* for the premise that Simmons can feasibly be allocated one hundred percent of the fault for his accident, but *Campbell* differs dramatically from the present case. In *Campbell*, a man walking on the beach at night without a flashlight fell into a drainage channel that was sixteen to eighteen feet wide. *Id*. at 1271, 1274 (¶¶1, 16). In that case, the circuit court held that Campbell was the sole proximate cause of the injury because not only had Campbell chosen to walk in an unfamiliar area late at night without a flashlight, but also no other accidents had been reported in the channels since they were built approximately sixty-eight years before. *Id*. at 1275-76 (¶¶20, 24). The court noted that "common sense must occasionally prevail" and that the injury in this case, though serious, "belong[s] to a class of ordinary accidents which are properly imputed to the carelessness [and] misfortune of the one injured." *Id*. at 1276 (¶25).

¶44.    This is the antithesis of our present case, where White, the witness who passed

22

Simmons on the road on the night of the accident, testified his trailer got "hung up on the edge" of the road as he tried to turn his truck and trailer around to assist Simmons. White testified further that he had almost "run off" the edge of Old River Road himself prior to the night of the accident, due to the steep drop-off. There were also previous accidents here. A patrol deputy with Jackson County Sheriff's Office testified by proffer to another car accident just ten days before Simmons' accident. Two cars had passed each other in opposite directions on the road and the "mirrors clipped." His narrative in the accident report stated that it appeared the lack of lines in the roadway was a contributing circumstance of the accident. And as discussed above, locals knew the area was dangerous.

¶45.    Jackson County, in its appellant brief, suggested that Simmons should have just avoided driving on the road that he lived on at night, as some testified they tried to do. But when looking at Old River Road on a map, it becomes apparent that not many alternate routes are available on this long county road. This is especially true for Simmons, who was driving a distance of a few miles from his deer camp to his home. As Simmons' friend Joey Rocco affirmed, the Old River Road construction-zone area extended "[l]iterally from where the Simmons lived all the way almost up to the hunting club." To avoid this area would be nearly impossible for Simmons that night. These circumstances differ wildly from the wide channel on the beach that Campbell stumbled into on a dark night. Because I believe that the circuit court misapplied the open-and-obvious principle in the negligence portion of Simmons' case, I believe this too rises to the level of manifest error.

¶46. In summary, the circuit court manifestly erred when it failed to recognize Jackson County as contributing proximate cause to Simmons' accident and when it incorrectly applied an "open and obvious" standard to the analysis of this case. Accordingly, I would reverse the circuit court's judgment that Simmons was the sole proximate cause of the accident and remand so that a portion of fault could properly be allocated to Jackson County. Because of the foregoing, I respectfully dissent.

**CARLTON, P.J., AND McDONALD, J., JOIN THIS OPINION.**